795 A.2d 857

BRENDAN O'CONNELL, PLAINTIFF–RESPONDENT, v. STATE OF NEW JERSEY, A BODY CORPORATE AND POLITIC, AND MONTCLAIR STATE, A UNIVERSITY OF THE STATE OF NEW JERSEY, DEFENDANTS–APPELLANTS,JOHN DOE CORP. 1–5 AND RICHARD ROE 1–5, DEFENDANTS.

Argued November 5, 2001—Decided May 6, 2002.

*Patrick DeAlmeida,* Deputy Attorney General, argued the cause for appellants (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Joanne Stipick,* Deputy Attorney General, on the briefs).

*James Koblin* argued the cause for respondent (*Horn Shechtman,* attorneys; *Ricky E. Bagolie,* of counsel).

*Marianne Bryant* submitted a brief on behalf of *amicus curiae,* Association of Trial Lawyers of America–New Jersey Chapter (*Friedman, Bafundo, Porter & Borbi,* attorneys).

The opinion of the Court was delivered by

ZAZZALI, J.

In this appeal we must determine whether Montclair State University (Montclair), a nonprofit, public educational institution, is entitled to immunity under the Charitable Immunity Act (CIA), *N.J.S.A.* 2A:53A–7 to –11. According to the CIA, an entity is entitled to immunity from suit by a beneficiary if the entity is a "nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes." *N.J.S.A.* 2A:53A–7a. Plaintiff Brendan O'Connell (O'Connell) alleges that because Montclair is a State college and receives public funding, it is not entitled to charitable immunity under the CIA, which O'Connell contends covers only private entities.

I

In October 1995, O'Connell, a full-time student at Montclair, was injured when he fell down a staircase in a campus amphitheater.

He suffered fractured ribs and a fractured elbow and was hospitalized for several days. O'Connell subsequently brought suit against Montclair and the State of New Jersey, seeking damages for his personal injuries.

Montclair filed an answer raising affirmative defenses under the New Jersey Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 59:12–3, and asserting that it was immune from suit under the CIA. Montclair also moved for summary judgment. The trial court granted the motion, finding that O'Connell was a "beneficiary" under the statute and that therefore Montclair was entitled to charitable immunity. Because the court concluded that O'Connell's action was barred by the CIA, it did not reach the applicability of Montclair's defenses under the TCA.

The Appellate Division reversed. *O'Connell v. State*, 335 *N.J.Super.* 427, 437, 762 *A.*2d 696 (App.Div.2000). The court held that despite Montclair's satisfaction of the CIA's "plain language" requirements for immunity, Montclair was not entitled to charitable immunity because the university's judgments are paid from public funds pursuant to the TCA and not from the funds of the educational institution. *Id.* at 434, 762 *A.*2d 696. According to the court, common law charitable immunity did not apply to public entities "whose liability judgments are paid by public funds." *Id.* at 434–35, 762 *A.*2d 696. Thus, the court determined that, based on the underlying purpose of common law charitable immunity, the Legislature did not intend that the CIA apply to public entities. *Ibid.* The court concluded that because Montclair is a public entity, it was not entitled to assert the defense of charitable immunity. *Id.* at 433–35, 762 *A.*2d 696. In so holding, the panel expressly disagreed with *Graber v. Richard Stockton College of New Jersey*, 313 *N.J.Super.* 476, 713 *A.*2d 503 (App.Div.), *certif. denied*, 156 *N.J.* 409, 719 *A.*2d 641 (1998), in which a different panel of the Appellate Division reached the opposite result. *Id.* at 434, 762 *A.*2d 696.

We granted Montclair's petition for certification, 168 *N.J.* 289, 773 *A.*2d 1153 (2001), and now reinstate the trial court's grant of summary judgment in favor of Montclair.

## II

" 'In the interpretation of a statute our overriding goal has consistently been to determine the Legislature's intent.' " *Young v. Schering Corp.*, 141 *N.J.* 16, 25, 660 *A.*2d 1153 (1995) (quoting *Roig v. Kelsey*, 135 *N.J.* 500, 515, 641 *A.*2d 248 (1994)). As a general rule, that process begins with an examination of the plain language of the statute. *Hubbard v. Reed*, 168 *N.J.* 387, 392, 774 *A.*2d 495 (2001); *State v. Butler*, 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). Where a statute is clear and unambiguous on its face and admits of only one interpretation, a court must infer the Legislature's intent from the statute's plain meaning. *V.C. v. M.J.B.*, 163 *N.J.* 200, 217, 748 *A.*2d 539, *cert. denied*, 531 *U.S.* 926, 121 *S.Ct.* 302, 148 *L.Ed.*2d 243 (2000); *Franklin Tower One v. N.M.*, 157 *N.J.* 602, 613, 725 *A.*2d 1104 (1999). A court may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language. *State v. Afanador*, 134 *N.J.* 162, 171, 631 *A.*2d 946 (1993); *State v. Wright*, 107 *N.J.* 488, 495, 527 *A.*2d 379 (1987). "[W]e need delve no deeper than the act's literal terms to divine the Legislature's intent." *Butler, supra*, 89 *N.J.* at 226, 445 *A.*2d 399.

In the present appeal, we are called on to interpret the scope of charitable immunity as set forth in the CIA. First recognized in this State in 1925, *D'Amato v. Orange Memorial Hospital*, 101 *N.J.L.* 61, 127 *A.* 340 (E. & A.1925), charitable immunity is grounded in the common law principle that

> it would be contrary to the interests of society that funds dedicated to a charitable use be permitted to be diverted or diminished by the payment of judgments resulting from the torts of agents, servants or employees of the organization or institution administering the charity where suit is instituted by the beneficiary of the charity.
>
> [*Jones v. St. Mary's Roman Catholic Church*,
> 7 *N.J.* 533, 537, 82 *A.*2d 187 (1951).]

After the doctrine fell into "disfavor as a matter of public policy," *Schultz v. Roman Catholic Archdiocese of Newark*, 95 *N.J.* 530, 536, 472 *A.*2d 531 (1984), this Court abolished it in 1958. *Benton*

*v. Y.M.C.A.,* 27 *N.J.* 67, 69, 141 *A.*2d 298 (1958); *Collopy v. Newark Eye & Ear Infirmary,* 27 *N.J.* 29, 39, 141 *A.*2d 276 (1958); *Dalton v. St. Luke's Catholic Church,* 27 *N.J.* 22, 24, 141 *A.*2d 273 (1958). In response, the Legislature adopted the CIA, reinstating "the common law doctrine as it had been judicially defined by the courts of this State." *Wiklund v. Presbyterian Church of Clifton,* 90 *N.J.Super.* 335, 338, 217 *A.*2d 463 (Cty.Ct.1966) (citing *Anasiewicz v. Sacred Heart Church,* 74 *N.J.Super.* 532, 535, 181 *A.*2d 787 (App.Div.), *certif. denied,* 38 *N.J.* 305, 184 *A.*2d 419 (1962)).

According to the CIA:

No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association. . . .

[*N.J.S.A.* 2A:53A–7a.]

Thus, an entity qualifies for charitable immunity when it "(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." *Hamel v. State,* 321 *N.J.Super.* 67, 72, 728 *A.*2d 264 (App.Div. 1999); *see also Loder v. St. Thomas Greek Orthodox Church,* 295 *N.J.Super.* 297, 301, 685 *A.*2d 20 (App.Div.1996) ("[I]n litigation concerning the [CIA], the focus is on whether the organization is a charitable association, and whether the injured plaintiff is a 'beneficiary' of its charitable works.").

Montclair contends that it is entitled to charitable immunity and that its receipt of public funds does not affect its status as a qualifying institution under the CIA. In support of its argument, Montclair relies primarily on the Appellate Division decision in *Graber,* where a student who sustained injury after fainting

during a physiology laboratory class. instituted a negligence suit against Richard Stockton College, a State college, and her professor. *Graber, supra,* 313 *N.J.Super.* at 478–79, 713 *A.2d* 503. The defendants asserted various affirmative defenses, including immunity under the TCA and charitable immunity under the CIA. *Id.* at 479, 713 *A.2d* 503. The Appellate Division affirmed the trial court's dismissal of the plaintiff's complaint, concluding that the college satisfied the CIA's requirements and therefore was entitled to charitable immunity. *Id.* at 483–85, 713 *A.2d* 503. The court observed that the college was a "nonprofit entity" and was "organized exclusively for religious, charitable or educational purposes." *Id.* at 482–83, 487, 713 *A.2d* 503. Further, because the plaintiff was a student of the college, the plaintiff clearly was a beneficiary of the college. *Id.* at 484, 713 *A.2d* 503.

The court rejected the plaintiff's contention that because the college enjoyed the protection of the TCA it did "not 'need' the additional protection of the [CIA]." *Id.* at 485, 713 *A.2d* 503. Rather, the college's "concurrent status as a public entity whose liability is controlled by the [TCA] does not alter its entitlement to immunity provided by [the CIA]." *Ibid.* In that respect, the court pointed out that "[t]he [TCA] incorporates into its provisions and affords to public entities 'any defenses that would be available to the public entity if it were a private person.'" *Ibid.* (quoting *N.J.S.A.* 59:2–1b). The court also noted that the comment to *N.J.S.A.* 59:2–1b directs courts to "'realistically interpret both the statutory and common law immunities in order to effectuate their intended scope.'" *Id.* at 486, 713 *A.2d* 503 (quoting comment to *N.J.S.A.* 59:2–1b). Accordingly, the court concluded that the CIA was a "defense[ ] ... available to a public entity if it were a private person." *Ibid.*

### III

#### A

The threshold question presented is not, as the Appellate Division stated, "whether the Legislature ever envisioned public

entities, such as state colleges, as being within the protective reach of the [CIA]," *O'Connell, supra,* 335 *N.J.Super.* at 434, 762 *A.*2d 696, but rather whether Montclair "satisf[ies][ ] each of the elements plainly set forth within [the CIA]," *Graber, supra,* 313 *N.J.Super.* at 481, 713 *A.*2d 503. Because the language of the CIA is plain, we need not look to extrinsic aids to determine the meaning of the words in the statute.

According to the CIA, an entity qualifies for charitable immunity from suit by a beneficiary if the entity is a "nonprofit corporation, society or association" that is "organized exclusively for religious, charitable, or educational purposes." *N.J.S.A.* 2A:53A–7. The statute protects a qualifying organization only from liability to "a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association...." *Ibid.* Here, as noted by the Appellate Division, it is undisputed that Montclair is "a nonprofit corporation ... created exclusively for educational purposes." *O'Connell, supra,* 335 *N.J.Super.* at 433, 762 *A.*2d 696. Additionally, as a student of Montclair engaging in educational pursuits, O'Connell is *"per se* a beneficiary" of Montclair. *Graber, supra,* 313 *N.J.Super.* at 484, 713 *A.*2d 503.

■ In respect of the Appellate Division's conclusion that the CIA applies only to private nonprofit entities, we note that the statute begins with the phrase *"[n]o* nonprofit corporation ... shall [ ] ... be liable." *N.J.S.A.* 2A:53A–7 (emphasis added). It does not state "[n]o *private* nonprofit corporation." Moreover, in *Schultz, supra,* this Court said of the CIA:

> Throughout the nation courts have varied words and theories in order to engraft exceptions onto the charitable immunity doctrine. That was acceptable so long as the doctrine was the creature of the common law. It is no longer acceptable, for *the Legislature has spoken and has directed the court to interpret the immunity liberally.*
>
> [95 *N.J.* at 539, 472 *A.*2d 531 (emphasis added).]

Thus, because the plain meaning of the statute supports the conclusion that Montclair is entitled to charitable immunity, the inquiry should end here. *Butler, supra,* 89 *N.J.* at 226, 445 *A.*2d 399. Accordingly, we expressly adopt the *Graber* court's determi-

nation that "[a]pplication of the statute turns on satisfaction of each of the elements plainly set forth within it." *Graber, supra,* 313 *N.J.Super.* at 481, 713 *A.*2d 503.

## B

Although we find that the statutory language is clear, and thus need not consider the Legislature's intent, we do so nonetheless to address the Appellate Division's assertion that the legislative history does not support the conclusion that Montclair is entitled to charitable immunity. The Appellate Division determined that the legislative history of the CIA demonstrates that the Legislature intended that charitable immunity apply only to entities that were covered under the common law. *O'Connell, supra,* 335 *N.J.Super.* at 434–35, 762 *A.*2d 696.

Courts have applied the charitable immunity defense to public entities both at common law and pursuant to statute. For example, in *Kress v. City of Newark,* 9 *N.J.Super.* 70, 76, 74 *A.*2d 902 (App.Div.1950), *rev'd on o.g.,* 8 *N.J.* 562, 86 *A.*2d 185 (1952), the Appellate Division considered the common law doctrine of charitable immunity in relation to a city-owned hospital. Although the city was denied immunity, that denial was based on the plaintiff's non-beneficiary status and the hospital's status as a public institution did not affect its entitlement to the common law defense. Further, in *Kent v. County of Hudson,* 102 *N.J.Super.* 208, 219, 245 *A.*2d 747 (App.Div.1968), *aff'd,* 53 *N.J.* 546, 251 *A.*2d 760 (1969), another Appellate Division panel found that the viability of the sovereign immunity doctrine available to a municipality in its operation of a hospital was strengthened by the immunity provided to charity hospitals through the CIA. Finally, in *Muntz v. Newark City Hospital,* 115 *N.J.Super.* 273, 277, 279 *A.*2d 135 (App.Div.1971), the court held that the charitable immunity statute applied to a publicly-owned hospital.

In holding that the CIA was intended to apply only to private nonprofit entities, the Appellate Division found persuasive the Assembly Judiciary Committee Chairman's statement that " '[w]e

are not talking about public schools. We are talking about schools operated by religious and charitable organizations.' " *O'Connell, supra*, 335 *N.J.Super.* at 432–33, 762 *A.*2d 696 (quoting *Public Hearing Before Assembly Judiciary Comm. on Assembly Comm. Substitute for Senate Bill No. S 204*, 107–08 (July 17, 1958)). However, that reliance is misplaced. The Legislature was attempting to restore the charitable immunity doctrine that had been judicially abrogated in three cases involving private charities. Thus, the members were likely focused on those recent cases and their effect on private organizations. The statement, although considered dispositive by the Appellate Division of legislative intent underlying the CIA, does not warrant such weight. Although the statement arguably evidences an "intent to exclude" public entities from the protection of the CIA, it also illustrates that, prior to enactment, the Legislature was well aware of the statute's broad language and that it could be interpreted to encompass any and all "nonprofit corporations." The Legislature never changed that language.

O'Connell relies on *Winters v. City of Jersey City*, 63 *N.J.* 7, 304 *A.*2d 196 (1973), where this Court adopted Judge Lynch's dissent in the Appellate Division. In his dissent, Judge Lynch reasoned that the city, and not the city hospital, was the proper defendant. *Winters v. City of Jersey City*, 120 *N.J.Super.* 129, 293 *A.*2d 431 (App.Div.1972), *modified on dissent*, 63 *N.J.* 7, 304 *A.*2d 196 (1973) (Lynch, J.A.D., concurring in part and dissenting in part). He concluded that the language of *N.J.S.A.* 2A:53A–7a, "organized exclusively for religious, charitable, or education purposes," is "taken almost *verbatim* from cases [that] relate to private charities only." *Id.* at 138, 293 *A.*2d 431. Thus, O'Connell asserts that, in enacting the CIA, the Legislature intended charitable immunity to apply only to private entity defendants.

We disagree. In *Winters*, unlike the instant case, the statute organizing the city-owned hospital required that, in its operation of the hospital, a municipality was to " 'be sued in all courts and elsewhere, in all manner of actions, suits, complaints and demands

whatsoever growing out of the creation and maintenance of such hospital.'" *Id.* at 136, 293 *A.2d* 431 (quoting *N.J.S.A.* 30:9–16). Further, the complaint named Jersey City, not the hospital, as a defendant and the municipality fully funded the hospital and completely controlled all operations.

Importantly, Judge Lynch recognized that the adoption of charitable immunity in *D'Amato* may have been understood as providing both private and public entities that defense. *Id.* at 150, 293 *A.2d* 431 (Lynch, J.A.D., concurring in part and dissenting in part). Judge Lynch noted that *D'Amato* was based partly on two Massachusetts cases, *McDonald v. Massachusetts General Hospital*, 120 *Mass.* 432 (1876), and *Roosen v. Peter Bent Brigham Hospital*, 235 *Mass.* 66, 126 *N.E.* 392 (1920)[1], where the Supreme Judicial Court of Massachusetts refused to impose liability on public hospitals and held that the hospitals were entitled to charitable immunity. *Ibid.* Although finding those cases distinguishable, Judge Lynch nevertheless described the defendant hospitals as "public charities." *Ibid.* He also acknowledged that in *Kress, supra,* the Appellate Division applied common law charitable immunity to a public entity, but dismissed the decision as an anomaly. *Id.* at 149, 74 *A.2d* 902.

In the present case Montclair is not a State-run institution, and, most important, is only partially funded by the State. According to the Vice President for Business and Finance for the University, Montclair's sources of funding are derived from tuition and charitable bequests in addition to State funding. In that respect, Montclair's varied source of funding is similar to that of the defendant Massachusetts General Hospital in *McDonald.* As noted, Judge Lynch described Massachusetts General Hospital as a "public charity" because its funds were not derived solely from "public funds", but rather from "grants, devises, donations, be-

---

[1] Both cases were overruled in part by *Colby v. Carney Hospital,* 356 *Mass.* 527, 254 *N.E.2d* 407 (1969), where the court stated "the next time we are squarely confronted by a legal question respecting the charitable immunity doctrine it is our intention to abolish it." *Id.* at 408.

quests and subscription of money and other property contributed by the commonwealth and benevolent persons." *Id.* at 151, 74 *A.*2d 902. Additionally, Montclair is exempt from federal and state taxation and its governing board is granted autonomy and control over its operations and financial management. *N.J.S.A.* 18A:64–1. Unlike the city hospital in *Winters,* Montclair does not " 'render[ ] services to which qualified citizens are entitled as a matter of legal right.' " *Winters, supra,* 120 *N.J.Super.* at 138, 293 *A.*2d 431 (quoting *White v. Charity Hosp. of Louisiana in New Orleans,* 239 *So.*2d 385, 386 (Ct.App.La.1970)). Instead, similar to private institutions, Montclair accepts students who voluntarily apply and qualify for entrance.

The Appellate Division also concluded that the primary purpose of charitable immunity at common law was protection of the charitable fund. *O'Connell, supra,* 335 *N.J.Super.* at 435, 762 *A.*2d 696. However, the court did not consider that concern applicable here because Montclair's judgments are paid by the State pursuant to the TCA. *Id.* at 437, 762 *A.*2d 696. Thus, the court held that Montclair was not entitled to charitable immunity because it is a "public entity[ ] whose liability judgments are paid by public funds." *Ibid.* We disagree.

■ The fact that a charitable entity receives public funds does not alter its status under the CIA. *Morales v. New Jersey Academy of Aquatic Sciences,* 302 *N.J.Super.* 50, 55, 694 *A.*2d 600 (App.Div.1997) ("[T]he acceptance of government funds and some measure of government control does not transform a private non-profit corporation into a governmental instrumentality."); *Parker v. St. Stephen's Urban Dev. Corp.,* 243 *N.J.Super.* 317, 327–28, 579 *A.*2d 360 (App.Div.1990) ("If a nonprofit corporation is performing a charitable service and is essentially supported through charitable contributions, the fact that it happens to receive some government support would not alter its nature as a charity for immunity purposes."). Indeed, there is a valid concern here that resources dedicated to charitable use by Montclair would be diverted or diminished by litigation. *See, e.g., Vitolo v. St. Peter's Church,* 118

*N.J.Super.* 35, 37, 285 *A.*2d 570 (App.Div.), *certif. denied,* 60 *N.J.* 285, 288 *A.*2d 27 (1972) (finding that charitable immunity applies even where charitable entity purchased policy of liability insurance to ensure that charitable bequests were not diverted to payment of tort claims). Thus, we note Montclair's representation that

the presence of [the Tort Claims fund] for the provision of counsel and the payment of any judgment or settlement does not end the cost to [Montclair]. Such a conclusion ignores the practical realities of litigation in the twenty-first century. Litigation involves a significant expenditure of time and resources of the litigants. Participation in the liberal discovery process requires input from institution personnel and places burdens upon them for review and analysis of institution policy and procedures as well as for review of records and documents relevant to the contested matter. The higher level of autonomy provided to the state colleges [by the Higher Education Restructuring Act] increases the responsibilities of the institution, all of which are compromised when personnel are required to take on the additional burden of participation in a lawsuit. Denial of the defense of charitable immunity to public colleges will place their financial resources at risk.

Moreover, on this issue, the statute's legislative history suggests that preservation of a charity's assets was only one of a number of purposes propelling the CIA's enactment. That the Legislature was motivated by something more than concern for protection of the charitable fund is illustrated by the statute's "beneficiary/stranger" distinction, limiting immunity to circumstances "where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association...." *N.J.S.A.* 2A:53A–7. Additionally, the "beneficiary" language of *N.J.S.A.* 2A:53A–7 is associated generally with the "implied waiver" theory. *See, e.g.,* 5 Fowler V. Harper, *et al., The Law of Torts* § 29.16, at 759–60 (2d ed. 1986) ("[The implied waiver or assumption of risk theory] ... would account for rulings that confine immunity to suits by beneficiaries of a charity."); *see also Schloendorff v. The Soc'y of New York Hosp.,* 211 *N.Y.* 125, 105 *N.E.* 92, 93 (1914), *superseded by statute on o.g., Retkwa v. Orentreich,* 154 *Misc.*2d 164, 584 *N.Y.S.*2d 710 (1992), (stating that "implied waiver" theory provides that "one who accepts the benefit of a charity enters into a relation [that] exempts one's benefactor from liability for the negligence ... in administering the charity"). If the Legislature, as the Appellate Division held, was primarily

motivated by the concern for protection of the charitable fund, it makes little sense that it then would include the "beneficiary/stranger" distinction. The imposition of tort liability has the potential to deplete a charitable fund regardless of whether the judgment is paid to a beneficiary or a stranger.

In sum, because an entity's receipt of public funds should not alter its status as a nonprofit entity under the CIA, we conclude that Montclair is entitled to charitable immunity. Further, irrespective of whether Montclair's judgments are paid from the Tort Claims fund, denial of charitable immunity would deplete Montclair's resources and therefore warrants application of the defense to protect the "charitable fund."

## C

The express language of the TCA also supports the conclusion that a public entity is entitled to the defense of charitable immunity under the CIA. In that respect, we adopt the reasoning set forth in *Graber, supra,* 313 *N.J.Super.* at 485–87, 713 *A.2d* 503.

The TCA provides that the defenses afforded public entities under the statute are not exclusive.

> Any liability of a public entity established by this act is subject to any immunity of the public entity and is subject to *any defenses that would be available to the public entity if it were a private person.*
>
> [*N.J.S.A.* 59:2–1b (emphasis added).]

Notably, the comment to *N.J.S.A.* 59:2–1b emphasized that

> [s]ubsection (b) is intended to insure that any immunity provisions in the act or by common law will prevail over the liability provisions. It is anticipated that the Courts will realistically interpret both the statutory and common law immunities in order to effectuate their intended scope.

The comment illustrates the Legislature's intent to incorporate into the TCA for the benefit of public entities all defenses available to their private counterparts. *Civalier by Civalier v. Estate of Trancucci,* 138 *N.J.* 52, 67, 648 *A.2d* 705 (1994) (characterizing such comments as having "something close to binding effect"); *Rochinsky v. State, Dep't of Transp.,* 110 *N.J.* 399, 407 n. 4, 541 *A.2d* 1029 (1988) (noting that such comments carry "precedential

weight and value of legislative history"). As noted by the court in *Graber, supra*, the CIA is one such available defense. 313 *N.J.Super.* at 485, 713 *A.2d* 503.

The charitable immunity defense was in existence at the time the TCA was enacted. *Township of Mahwah v. Bergen County Bd. of Taxation*, 98 *N.J.* 268, 279, 486 *A.2d* 818, *cert. denied*, 471 *U.S.* 1136, 105 *S.Ct.* 2677, 86 *L.Ed.2d* 696 (1985) (stating that Legislature is presumed to be aware of existing legislation at time statute is enacted). Further, our Court and the Appellate Division have construed numerous statutory and common law defenses as available to public entities, regardless of whether those defenses existed at the time of the TCA's enactment. *See, e.g., Tice v. Cramer*, 133 *N.J.* 347, 369, 627 *A.2d* 1090 (1993) (applying common law immunity to police officer involved in high-speed chase); *In re Martin*, 90 *N.J.* 295, 335, 447 *A.2d* 1290 (1982) (applying non-TCA statutory immunity to Casino Control Commission); *Davenport v. Borough of Closter*, 294 *N.J.Super.* 635, 639–42, 684 *A.2d* 100 (App.Div.1996) (applying common law immunity for snow removal to municipality); *Del Tufo v. Township of Old Bridge*, 278 *N.J.Super.* 312, 319–23, 650 *A.2d* 1044 (App.Div.1995), *aff'd*, 147 *N.J.* 90, 685 *A.2d* 1267 (1996) (applying defense of contributory/comparative negligence to public entity); *Morey v. Palmer*, 232 *N.J.Super.* 144, 151–52, 556 *A.2d* 811 (App.Div.1989) (holding police officer and municipality immune from liability resulting from officer's discretionary determination); *Delbridge v. Schaeffer*, 238 *N.J.Super.* 323, 353–54, 569 *A.2d* 872 (Law Div.1989) (applying common law limitation on doctrine of respondeat superior to public employee supervisor); *D'Eustachio v. Beverly*, 177 *N.J.Super.* 566, 575, 427 *A.2d* 126 (Law Div.1979) (stating that immunity provided volunteer fire companies under *N.J.S.A.* 2A:53A–13 "must be read as one of the immunities protected by and through ... *N.J.S.A.* 59:2–1(b), even though it was enacted after the act").

The dissent believes that "simultaneous application of [both the CIA and the TCA to public entities] is discordant and incongruous." *Post* at 501. We respond, simply, that in reaffirming any

defense a private institution would have in addition to the immunities provided by the TCA, *N.J.S.A.* 59:2–1b, the TCA contemplates that its provisions will operate simultaneously with other common law and statutory immunities in a proper case. If the Legislature intended the TCA to be the only controlling statute, the Legislature would not have included such language.

## D

Finally, as a matter of public policy, State and private colleges should be treated in a like manner for purposes of entitlement to the charitable immunity defense. We note that the Higher Education Restructuring Act of 1994, *N.J.S.A.* 18A:3B–1 to –36, was intended to place the operations of State colleges on a par with private colleges. *N.J.S.A.* 18A:3B–2. Both State and private colleges receive public funding, a portion of which may be used within the wide discretion of the institution for various purposes including the payment of tort judgments. It would be paradoxical, and inconsistent, to hold that "the public policy for the protection of nonprofit corporations ... organized for ... educational ... purposes" does not apply to public universities. *N.J.S.A.* 2A:53A–10.

## IV

We conclude that the CIA was enacted to protect non-profit institutions, such as Montclair, that provide educational services. State colleges plainly meet the statutory definition of a charitable institution under the CIA—a "nonprofit corporation ... organized exclusively for ... educational purposes." *N.J.S.A.* 2A:53A–7a. It is not the Court's province "to engraft exceptions onto the charitable immunity doctrine" as "the Legislature has spoken and has directed the court to interpret the immunity liberally." *Schultz, supra,* 95 *N.J.* at 539, 472 *A.*2d 531. To the extent that the CIA applies to privately-operated "nonprofit corporation[s] ... organized exclusively for ... educational purposes," it also

should be applied to publicly-operated "nonprofit corporation[s] . . . organized exclusively for . . . educational purposes."

Accordingly, we reverse the judgment of the Appellate Division and reinstate the Law Division's grant of summary judgment in favor of defendants.

STEIN, J., dissenting.

The issue is whether Montclair State University (Montclair State), a nonprofit state college, is entitled to immunity under the Charitable Immunity Act (the Act), *N.J.S.A.* 2A:53A-7 to -11. The Court concludes that it is, relying heavily on the Act's "plain meaning."

I emphatically disagree. The Court's reliance on the Act's plain meaning collides with the principle that statutes often must be read "sensibly" rather than "literally" to avoid misapplication of the legislative intent. See *State v. State Troopers Fraternal Ass'n.* 134 *N.J.* 393, 417–18, 634 *A.2d* 478 (1993) ("Despite the literal applicability of the discipline amendment to all public employers whose employees are unprotected by Civil Service . . . we are thoroughly convinced that the Legislature did not intend the discipline amendment to apply to the State Police and we now so hold.").

Because I cannot improve on Judge Havey's comprehensive and well-reasoned opinion for the Appellate Division, *O'Connell v. State*, 335 *N.J.Super.* 427, 762 *A.2d* 696 (App.Div.2000), I rely on it completely to support my firm belief that the Act never was intended to apply to nonprofit state colleges. I add only these observations that echo significant aspects of Judge Havey's analysis.

Although enacted in 1958, apparently the Act rarely, if ever, was relied on by a state college defending a tort claim prior to *Graber v. Richard Stockton College of New Jersey*, 313 *N.J.Super.* 476, 713 *A.2d* 503 (App.Div.), *certif. denied,* 156 *N.J.* 409, 719 *A.2d* 641 (1998). Judge Havey cites cases as far back as 1975 to support his

observation that for the past three decades the Attorney General has relied only on the New Jersey Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 59:12–3 to defend such cases. *O'Connell, supra,* 335 *N.J.Super.* at 435, 762 *A.*2d 696. That the Attorney General has assumed these past thirty years that the TCA and not the Charitable Immunity Act governs the tort liability of nonprofit state colleges might give the Court cause for concern about its holding.

Even more troublesome is that simultaneous application of the two statutes is discordant and incongruous. The Charitable Immunity Act provides total immunity for tort claims by "beneficiaries," *N.J.S.A.* 2A:53A–7, but permits liability of up to $250,000 for claims against hospitals by beneficiaries; the Act permits unlimited liability for claims by non-beneficiaries, *N.J.S.A.* 2A:53A–8. In all other respects, claims by beneficiaries and non-beneficiaries are governed by the same legal principles that apply to tort actions involving private citizens. In contrast, under the TCA, even if no statutory or common-law immunity applies, the statute imposes specific conditions on a public entity's liability. As the Appellate Division cogently observed:

> For example, [the TCA]: (1) imposes strict notice requirements, *N.J.S.A.* 59:8–8; (2) requires proof that the public entity's conduct was palpably unreasonable, see e.g., *N.J.S.A.* 59:4–2; and (3) limits recovery for pain and suffering, *N.J.S.A.* 59:9–2d. Coupling the "beneficiary" defense (N.J.S.A.2A:53A–7) and the limit to recovery (*N.J.S.A.* 2A:53A–8) under the Act with the immunities and conditions of liability imposed by the TCA may present an insurmountable burden for an injured litigant to overcome, and provides the public entity with an imbalanced array of defenses merely because it may be, for example, a nonprofit entity created exclusively for educational purposes.
>
> [*O'Connell, supra,* 335 *N.J.Super.* at 436, 762 *A.*2d 696.]

The point is that in the TCA the Legislature comprehensively addressed the conditions under which public entities like Montclair State should be liable in tort, and in doing so expressed not one word suggestive of a legislative intent to supplement those carefully crafted conditions with the immunity provisions of the Charitable Immunity Act passed fourteen years earlier. Moreover, the Legislature afforded Montclair State the opportunity for indemni-

fication for adverse tort judgments out of the fund created by the TCA. See *N.J.S.A.* 59:12-1. The Court errs grievously when it, in effect, rewrites the TCA as applied to nonprofit state colleges by superimposing on it the provisions of the Charitable Immunity Act that the Legislature intended to apply only to private nonprofit entities.

I would affirm the judgment of the Appellate Division.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices COLEMAN, VERNIERO, LaVECCHIA and ZAZZALI—5.

*For affirmance*—Justice STEIN—1.