NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5423-17T3

JOHNSON & JOHNSON,

    Plaintiff-Appellant,

v.

DIRECTOR, DIVISION OF
TAXATION, and COMMISSIONER,
DEPARTMENT OF BANKING
AND INSURANCE,

    Defendants-Respondents.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **September 25, 2019** |
| **APPELLATE DIVISION** |

Submitted September 18, 2019 – Decided September 25, 2019

Before Judges Fuentes, Haas and Mayer.

On appeal from the Tax Court of New Jersey, Docket
No. 013502-2016, whose opinion is reported at 30 N.J.
Tax 479 (Tax Ct. 2018).

Wilson Law Group, LLC, attorneys for appellant
(Margaret C. Wilson and Beth F. Bressler, on the
briefs).

Gurbir S. Grewal, Attorney General, attorney for
respondents (Melissa H. Raksa, Assistant Attorney
General, of counsel; William B. Puskas, Jr., Deputy
Attorney General, on the brief).

The opinion of the court was delivered by

HAAS, J.A.D.

In this appeal, we address the issue of whether, following the Legislature's 2011 amendment of N.J.S.A. 17:22-6.64, plaintiff Johnson & Johnson (J&J) was required to pay an insurance premium tax (IPT) based upon all the risks it insured throughout the United States or based upon only those risks localized in New Jersey. Because both before and after the 2011 amendment, N.J.S.A. 17:22-6.64 provided that IPT was to be calculated at the rate of "5% of the gross amount of such premium" paid for insurance procured "upon a subject of insurance resident, located or to be performed within [New Jersey]," we conclude that J&J's IPT obligation should have continued to be based solely upon the risks it insured that were located within New Jersey, rather than upon the total United States premium for the applicable coverage policies. Accordingly, we reverse the Tax Court's contrary interpretation of the statute which is at odds with the plain language of N.J.S.A. 17:22-6.64, and remand for further proceedings.

The facts underlying the dispute between the parties are fully set forth in the Tax Court's decision, Johnson & Johnson v. Director, Div. of Taxation, 30 N.J. Tax 479, 485-91 (Tax Ct. 2018), and are not in dispute. J&J is a New Jersey corporation headquartered in New Brunswick that engages in a global pharmaceutical, medical device, and consumer health care business. Id. at 485.

In 1970, plaintiff formed Middlesex Assurance Company Limited (Middlesex Assurance) to secure broader coverage and lower the costs and fees associated with its substantial global insurance needs. Id. at 485-86. Incorporated in Bermuda and subsequently re-domiciled in Vermont, Middlesex Assurance provides insurance coverage only to J&J and J&J's risks in the United States. Ibid. Middlesex Assurance can only conduct business in Vermont and exclusively sells insurance coverage to J&J's corporate risk management group. Id. at 486. Headquartered in New Brunswick, J&J's corporate risk management group is responsible for placing and servicing the vast insurance programs that cover J&J, its subsidiaries, and its affiliates. Ibid.

From an insurance perspective, Middlesex Assurance is a "single-parent" or "pure" captive insurance company. Ibid. A captive insurance company is one that insures the liabilities of its owner, who is typically its only shareholder and insured. Black's Law Dictionary 926 (10th ed. 2010). A single parent or a "pure" captive insurance company "insure[s] only the risk of its parent." Captive Insurance Companies, https://www.naic.org/cipr_topics/topic_captives.htm (last visited September 18, 2019).

The tax consequences that flow from this classification form the basis of the parties' dispute in the present appeal. Specifically, this dispute arises as a

result of statutory amendments our State's Legislature enacted in response to the Nonadmitted and Reinsurance Reform Act (NRRA), 15 U.S.C. § 8201 to § 8206. In relevant part, the NRRA specified rules for the reporting, payment, and allocation of IPT for nonadmitted insurance. 15 U.S.C. § 8201(a).

By way of background, there are two different insurances markets: admitted and nonadmitted insurance or, as they are known in New Jersey, authorized and unauthorized. Johnson & Johnson, 30 N.J. Tax. at 495. An "authorized insurer" is one who has a license to transact business within a particular state whereas an "unauthorized insurer" is one who does not. See 2 Julie Mix McPeak, New Appleman on Insurance Law Library Edition §§ 9.06, 9.09. Although an unauthorized insurer does not have a license to transact business in a given state, citizens have a constitutional right to purchase insurance from the company of their choosing. See Allgeyer v. Louisiana, 165 U.S. 578, 588 (1897). Therefore, unauthorized insurance companies can still issue insurance policies to residents of states in which they are not licensed under certain circumstances. See, e.g. N.J.S.A. 17:22-6.42, -6.64.

In New Jersey, there are two main types of unauthorized insurance markets: the surplus lines market and the self-procured market. See N.J.S.A. 17:22-6.64. As the Tax Court correctly stated in this case, these two markets

"are separate and distinct from each other." Johnson & Johnson, 30 N.J. Tax at 502.

"Surplus lines insurance involves New Jersey risks which insurance companies authorized or admitted to do business in this State have refused to cover by reason of the nature of the risk." Railroad Roofing & Bldg. Supply Co. v. Fin. Fire & Cas. Co., 85 N.J. 384, 389 (1981). The surplus lines market involves insurance obtained from a surplus line agent who is licensed to place coverage from a surplus lines insurer. N.J.S.A. 17:22-6.41, -6.42, -6.45. It is regulated by the Surplus Lines Law, N.J.S.A. 17:22-6.40 to -6.67. That statutory scheme defines a surplus lines agent as "an individual licensed as a surplus lines insurance producer with surplus lines authority . . . to handle the placement of insurance coverages on behalf of unauthorized insurers." N.J.S.A. 17:22-6.41(a) (citation omitted). A surplus lines insurer is "an unauthorized insurer in which an insurance coverage is placed or may be placed under [the] surplus lines law." N.J.S.A. 17:22-6.41(b). The Surplus Lines Law outlines specific requirements for eligibility as a surplus lines insurer, and explicitly does not apply to "insurance coverages which are [self-procured] as provided in [N.J.S.A. 17:22-6.64]." N.J.S.A. 17:22-6.40.

A-5423-17T3

The self-procured insurance market consists of unauthorized insurers directly providing coverage to the insured. N.J.S.A. 17:22-6.64. Put differently, this insurance is "independently procured" and obtained without the assistance of a surplus lines agent. N.J.S.A. 17:22-6.40, -6.64. By definition then, insurance that is independently or self-procured cannot be a surplus lines policy since "such coverage[] . . . must be so placed through a licensed New Jersey surplus lines agent." N.J.S.A. 17:22-6.42.

As the Tax Court properly recognized, "[c]aptive insurance . . . is a part of the self-procured insurance market." Johnson & Johnson, 30 N.J. at 501. While an insured may presumably use a captive insurance company to independently procure surplus lines coverage through a surplus lines agent that did not occur in the present case. Instead, J&J used Middlesex Assurance for routine insurance coverage that included but was not limited to, "Worker Compensation, Automobile Liability, General Liability, Product Liability, Excess Product Liability, Executive Protection, Property, and Casualty coverages." Id. at 485. None of the coverage that J&J procured can be characterized as surplus lines insurance.

The taxation of surplus lines insurance and self-procured insurance coverages are also separate and distinct. Prior to 2011, the year in which the

NRRA went into effect, New Jersey collected IPT on all unauthorized insurance covering New Jersey risks. Surplus lines insurance was taxed under the authority of N.J.S.A. 17:22-6.59 (2010). That statute required the insurance agent to "collect from the insured" a "tax of 5% of all gross premiums" charged by the insurer, and to remit this amount to the State. Ibid. The statute further stated: "If a surplus lines policy covers risks or exposures only partially in this State, the tax payable shall be computed on the portion of the premium which is properly allocable to the risks or exposures located in this State."

On the other hand, the tax on insurance coverage that an insured independently procures from a captive insurer located outside the State is handled differently. This is so because, as the Tax Court properly found, "the New Jersey Legislature specifically and unambiguously determined that the self-procurement statute [N.J.S.A. 17:22-6.64] was not subject to the Surplus Lines Law." Johnson & Johnson, 30 N.J. Tax at 501. Indeed, N.J.S.A. 17:22-6.40 specifically states that the Surplus Lines Law does not apply "to insurance coverages which are independently procured as provided in" N.J.S.A. 17:22-6.64, which governs the taxation of the premiums paid for these coverages. N.J.S.A. 17:22-6.40.

7

Prior to the 2011 amendments at issue here, N.J.S.A. 17:22-6.64 (2010) required the insured to directly pay a 5% tax (the IPT) on the gross premiums it paid to procure "excess loss, catastrophe or other insurance" with an unauthorized captive insurer. Johnson & Johnson, 30 N.J. Tax at 501. This tax had to be paid only if the insurance provided coverage "upon a subject of insurance resident, located or to be performed with this State, other than insurance procured through a surplus lines agent pursuant to" N.J.S.A. 17:22-6.59. N.J.S.A. 17:22-6.64 (2010).

To summarize:

> From 1960 until 2011, the premium receipts tax [paid by insurance agents under N.J.S.A. 17:22-6.59 for surplus lines insurance coverage] and the self-procurement tax [paid by the insured under N.J.S.A. 17:22-6.64 for coverage obtained from an unauthorized captive insurer] were calculated based on an allocation of the insured's risks within the state. If an insured had risks outside of New Jersey, the tax only applied to that portion of the premium allocable to the risks in New Jersey. Other states with nexus to the insured were also able to impose and collect nonadmitted IPT from the insured.
>
> [Johnson & Johnson, 30 N.J. Tax at 503.]

In 2008, J&J began to remit IPT to New Jersey under N.J.S.A. 17:22-6.64 after it reported to the Department of Banking and Insurance (DOBI) that it was transacting business with Middlesex Assurance that would make it subject to

8

that statute.  Id. at 488 n.8.[1]  J&J never purchased surplus lines insurance from Middlesex Assurance and, therefore, the State never assessed it surplus lines insurance tax under N.J.S.A. 17:22-6.59.  Pursuant to the clear language of N.J.S.A. 17:22-6.64, which provided that IPT was only to be assessed on "subject[s] of insurance resident, located or to be performed within" New Jersey, "[t]he amount of tax due [from J&J] was calculated . . . based only on that portion of the premium allocated to risks in New Jersey."  Johnson & Johnson, 30 N.J. Tax at 488.

In 2011, the NRRA became effective.  Ibid.  In pertinent part, the NRRA created the "Home State Rule," which provides that "[n]o State other than the home State of an insured may require any premium tax payment for nonadmitted insurance."  Id. § 8201(a).  The NRRA defines "Home State" as either

> (i) the State in which an insured maintains its principal place of business or, in the case of an individual, the individual's principal residence; or
>
> (ii) if 100 percent of the insured risk is located out of the State referred to in clause (i), the State to which the greatest percentage of the insured's taxable premium for that insurance contract is allocated.
>
> [Id. § 8206(6)(A).]

---

[1]  J&J paid these taxes retroactive to 2005.  Ibid.

The NRRA also defines a nonadmitted insurer as an insurer who is not licensed to engage in the insurance business of a particular state. Id. § 8206(11). Nonadmitted insurance under the statute is "any property and casualty insurance permitted to be placed directly or through a surplus lines broker with a nonadmitted insurer eligible to accept such insurance." Id. § 8206(9).

The Tax Court accurately described the relevance of the enactment of the NRRA to the statutory interpretation issue presented in our case in the following terms:

> The NRRA sought to clarify and simplify the process for collecting nonadmitted premium taxes by creating a uniform system of premium taxation for nonadmitted insurance covering multistate risks. To accomplish this, the NRRA provided that "no state other than the home state of an insured may require any premium tax payment for nonadmitted insurance" ("Home State Rule"). 15 U.S.C. § 8201(a).
>
> [Johnson & Johnson, 30 N.J. Tax at 498.]

Significantly, the Tax Court noted, and we agree, that "[t]he NRRA does not require taxation, nor does it specify that a home state has the authority to tax 100 percent of [United States] premiums. However, the Home State Rule gives the home state the authority to tax all nonadmitted insurance premiums in the [United States.]" Ibid. (emphasis added). "[I]n order for states to avail themselves of this authority, and to offset the loss of tax revenue, they had to

amend their nonadmitted IPT statutes." Id. at 499. However, nothing in the NRRA required the states to do so either in whole or in part. Id. at 498.

Following the enactment of the NRRA, the New Jersey Senate introduced legislation to "[r]evise methods of regulation and collection of surplus lines insurance premium taxes." S. 2930 (2011) (emphasis added). As the Tax Court specifically found after carefully reviewing the parties' submissions on the question of legislative intent, nothing in the legislative history of the enactment that followed, L. 2011, c. 119, indicated that the amendments related to anything other than the taxation of insurance premiums paid for surplus lines coverage. Johnson & Johnson, 30 N.J. Tax at 512. In short, the taxation of independently procured insurance from an unauthorized captive insurer was not specifically mentioned in any of the committee statements pertaining to the 2011 amendments.

With regard to those amendments, Section 1 of L. 2011, c. 119 amended N.J.S.A. 17:22-6.41 to define "home state" consistently with how that term is defined under NRRA. As noted above, prior to the 2011 amendment N.J.S.A. 17:22-6.59 provided that "[i]f a surplus lines policy covers risk or exposures only partially in this State, the tax payable shall be computed on the portion of the premium which is properly allocable to the risks or exposures located in this

State." However, Section 2 of L. 2011, c. 119 specifically amended N.J.S.A. 17:22-6.59 to permit the State, for the first time, to tax all the premiums collected by the surplus lines agent for surplus lines coverage provided in New Jersey and other states if New Jersey was the home state under N.J.S.A. 17:22-6.41. As amended, and in pertinent part, N.J.S.A. 17:22-6.59 now states:

> If a surplus lines policy covers risks or exposures in this State and other states, where this State is the home state, as defined in [N.J.S.A. 17:22-6.41], the tax payable pursuant to this section shall be based on the total United States premium for the applicable policy.

Section 3 of L. 2011, c. 119 amended N.J.S.A. 17:22-6.64 to include the same paragraph quoted immediately above. Thus, N.J.S.A. 17:22-6.64 now states in pertinent part:

> If a surplus lines policy covers risks or exposures in this State and other states, where this State is the home state, as defined in [N.J.S.A. 17:22-6.41], the tax payable pursuant to this section shall be based on the total United States premium for the applicable policy.

However, nothing else in the statute was changed. Thus, N.J.S.A. 17:22-6.64 continues to provide, as it did before the amendment, that the insured must pay a 5% tax on the gross amount of any premium it pays to a nonadmitted captive insurer "upon a subject of insurance resident, located or to be performed within this State, other than insurance procured through a surplus lines agent pursuant

to the surplus lines law of this State or exempted from tax under [N.J.S.A. 17:22-6.59]."

As stated above, J&J never purchased surplus lines coverage through Middlesex Assurance and, on the face of the 2011 amendments which only applied to surplus lines insurance, was still only required to pay IPT upon the premiums it paid for coverage involving a "subject of insurance resident, located or to be performed within" New Jersey. N.J.S.A. 17:22-6.64. Indeed, the record contains no evidence that the State ever assessed J&J for a tax based on the total premium it paid for all of the coverage it purchased from Middlesex Assurance for risks or exposures in New Jersey and the other forty-nine states.

Nevertheless, and "as a precautionary measure," J&J "began to calculate and remit [IPT] based on its total [United States] premiums" shortly after the Legislature enacted L. 2011, c. 119 in August 2011. Johnson & Johnson, 30 N.J. Tax at 489. J&J continued to make these voluntary payments until November 2015, when it filed a claim with DOBI and the Director of the Division of Taxation (Division) seeking a refund of IPT in the amount of $55,902,070.95, plus interest. Ibid.

The Division denied J&J's refund claim in August 2016, and J&J thereafter filed a complaint against the Division and DOBI in the Tax Court. Id.

at 489-90. Because the facts were not in dispute and the matter involved only a question of law, the parties each filed motions for summary judgment. Id. at 490-91.

J&J argued that the 2011 amendments to N.J.S.A. 17:22-6.59 and N.J.S.A. 17:22-6.64 that allowed the State to impose an IPT based upon the total premium paid by an insured for all risks covered in the entire United States only applied to surplus lines insurance coverage. Here, J&J did not purchase any surplus lines coverage from Middlesex Assurance and, therefore, it asserted that its IPT should continue to be assessed based solely "upon [those] subject[s] of insurance resident, located or to be performed within this State" as expressly stated in N.J.S.A. 17:22-6.64.

In response, the Division and DOBI (sometimes referred to collectively as the State) argued, as they do again in this appeal, that the Legislature has always treated IPT imposed under N.J.S.A. 17:22-6.59 and -6.64 "as the same tax since their enactment in 1960" and that the only difference between the two taxes is that the surplus lines agent pays the tax under N.J.S.A. 17:22-6.59, and the insured pays the tax directly under N.J.S.A. 17:22-6.64. The State also contended that the fact that the Legislature only, and consistently, referred to surplus lines insurance coverage when it amended these two statutes, was merely

a "loophole" that should not act to excuse J&J from paying taxes on coverage that has never involved surplus lines insurance.

Following oral argument, the Tax Court rendered a written opinion on June 15, 2018. For the most part, the Tax Court agreed with J&J's position. Thus, the Tax Court found that while N.J.S.A. 17:22-6.64 was included in the Surplus Lines Law, this provision is merely "a catch-all for nonadmitted insurers not regulated by the Surplus Lines Law." Johnson & Johnson, 30 N.J. Tax at 501. Indeed, the Tax Court noted that "[d]espite being contained within the four corners of the [Surplus Lines Law,] the New Jersey Legislature specifically and unambiguously determined that the self-procurement statute [N.J.S.A. 17:22-6.64] was not subject to the Surplus Lines Law." Ibid. Accordingly, the Tax Court concluded that "self-procured insurance coverages" that an insured procures from an unauthorized captive insurance company, which is not surplus lines coverage, "are exempt from the provisions of the Surplus Lines Law, and have their own prescribed tax, albeit at the same rate as the premium receipts tax" paid for surplus lines coverage under N.J.S.A. 17:22-6.59. See id. at 501, 510.

The Tax Court further found that the Legislature "did not remove the portion of the original statutory language in N.J.S.A. 17:22-6.64 that applied the

[IPT] to premiums paid 'upon a subject of insurance resident, located or to be performed within this State.'" Id. at 509. And, as noted above, the Tax Court specifically held that there was no pertinent legislative history indicating any intent by the Legislature to permit the State to tax an insured under N.J.S.A. 17:22-6.64 on the total premium it paid for all the coverage it obtained throughout the United States. Id. at 512.

The Tax Court also rejected the State's contention "that the term 'surplus lines policy' is applicable to both types of insurance" under N.J.S.A. 17:22-6.59 and -6.64. Id. at 511. As the Tax Court stated, J&J had not obtained any surplus lines coverage from Middlesex Assurance. Id. at 485. Thus, the Tax Court held that the State's application of this term was "contrary to the NRRA, contrary to the Surplus Lines law, and not meaningfully defensible." Id. at 511.

Nevertheless, the Tax Court ruled that the Legislature must have intended to include the insurance J&J procured under N.J.S.A. 17:22-6.64 "in the adoption of the Home State Rule because it intended to include all nonadmitted insurers, and not to limit it to only surplus lines insurance." Id. at 512. In support of this determination, the Tax Court stated that the Legislature amended N.J.S.A. 17:22-6.64 at the same time it amended N.J.S.A. 17:22-6.59. Therefore, the Tax Court reasoned that the Legislature likely intended to treat

both types of insurance the same by basing the tax upon total United States premiums rather than upon the premium paid to cover New Jersey risks and exposures. Ibid. Otherwise, the Tax Court held, there was no reason for the Legislature to refer to surplus lines coverage in its amendment to N.J.S.A. 17:22-6.64. Id. at 512-13.

At the same time, however, the Tax Court recognized that the Legislature "fail[ed] to remove the original language [in N.J.S.A. 17:22-6.64] allocating the IPT to the location of the risk" rather than permitting an assessment to be made on the total United States premium. Id. at 513. Even so, the Tax Court concluded that "[w]hile reasonable minds may disagree, this court finds the legislative intent to be more persuasive than the precise language of N.J.S.A. 17:22-6.64. Furthermore, the court has hope that, beginning with this decision, any confusion and inconsistences will be addressed and remedied." Id. at 512-13. This appeal followed.

On appeal, J&J contends that the Tax Court erred by interpreting N.J.S.A. 17:22-6.64 as subjecting it to the Home State Rule and requiring it to pay IPT on the total premium it pays for all of the insurance it procures through Middlesex Assurance throughout the United States. J&J points out that the Legislature in both N.J.S.A. 17:22-6.59 and -6.64 only extended the Home State

Rule to surplus lines policies, which J&J has never procured from Middlesex Assurance. Indeed, the Legislature did nothing to alter the language in N.J.S.A. 17:22-6.64 that clearly provides that J&J is only required to pay IPT for the insurance it obtains from Middlesex Assurance "upon a subject of insurance resident, located or to be performed within this State, other than insurance procured through a surplus lines agent pursuant to the surplus lines law of this State[.]" Because the Tax Court extended the Home State Rule beyond the limits established by the Legislature, J&J argues that the Tax Court's decision should be reversed. We agree.

Our standard of review of the Tax Court's decision is well settled. We review the Tax Court's grant of summary judgment to the State de novo, applying the same legal standards employed by that tribunal. Waksal v. Director, Div. of Taxation, 215 N.J. 224, 231-32 (2013). While the "factual findings of a Tax Court judge are entitled to deference because of that court's expertise in the field, the judge's interpretation of a statute is not subject to such deference" under our de novo review. Id. at 231 (quoting Advance Hous., Inc. v Twp. of Teaneck, 422 N.J. Super. 317, 327 (App. Div. 2011)).

Here, we must determine whether J&J is obligated to pay a tax under the 2011 amendment to N.J.S.A. 17:22-6.64 on the premium it pays Middlesex

Assurance for the insurance coverage it receives for subjects located in New Jersey, or for all of the insurance coverage it maintains throughout the United States. In interpreting statutes, our primary goal is discerning the Legislature's intent. Garden State Check Cashing Serv. Inc. v. State, Dep't of Banking & Ins., 237 N.J. 482, 489 (2019). "[G]enerally, the best indicator of that intent is the statutory language." Ibid. (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). Thus, our analysis of a statute begins with its plain language, giving the words their ordinary meaning and significance. Ibid. Where the language is clear and unambiguous, and subject to only one interpretation, we must infer the Legislature's intent from the statute's plain meaning. Ibid.; O'Connell v. State, 171 N.J. 484, 488 (2002). "A court may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language." O'Connell, 171 N.J. at 488.

These principles of statutory interpretation apply equally in the context of tax statutes with one additional constraint. As our Supreme Court has explained, two considerations guide our analysis of a tax statute:

> First, the court should follow the clear import of statutory language . . . Second, when interpretation of a taxing provision is in doubt, and there is no legislative

history that dispels that doubt, the court should construe the statute in favor of the taxpayer.

[Fedders Fin. Corp. v. Dir., Division of Taxation, 96 N.J. 376, 384 (1984) (citation omitted).]

Applying these standards, we are constrained to conclude that the Tax Court erred in interpreting the 2011 amendment to N.J.S.A. 17:22-6.64 to permit the State to assess IPT on all of the premiums paid by J&J for insurance coverage it obtained through Middlesex Assurance throughout the United States. Nothing in the plain language of the statute, as amended, supports this interpretation.

Prior to the amendment, N.J.S.A. 17:22-6.64 expressly stated:

> Every insured who in this State procures or causes to be procured or continues or renews insurance with an unauthorized foreign or alien insurer, or any insured or self-insurer who procures or continues excess loss, catastrophe or other insurance, upon a subject of insurance resident, located or to be performed within this State, other than insurance procured through a surplus lines agent pursuant to the surplus lines law of this State . . . under [N.J.S.A. 17:22-6.59] . . . [shall pay] a tax at the rate of 5% of the gross amount of such premium less any return premiums charged for such insurance.

This language, which clearly limited J&J's tax liability to the risks it insured in New Jersey, was not changed in any way, shape, or form in the 2011 amendment to N.J.S.A. 17:22-6.64. See L. 2011, c. 119, § 3. Thus, J&J had no obligation to pay an additional tax on the premiums it paid to insure risks outside

of this State.  Because the language of the statute is plain, and remained the same after the 2011 amendment, we are bound to follow and apply it.

In reaching its contrary conclusion, the Tax Court pointed to the fact that the Legislature included a paragraph in N.J.S.A. 17:22-6.64 concerning the taxation of surplus lines coverage.  As already noted, this paragraph stated:

> If a surplus lines policy covers risks or exposures in this State and other states, where this State is the home state, as defined in [N.J.S.A. 17:22-6.41], the tax payable pursuant to this section shall be based on the total United States premium for the applicable policy.

The Tax Court reasoned that because this provision refers to the Home State Rule and permits the State to impose a tax on premiums paid throughout the entire United States on surplus lines policies, the Legislature must have intended to also apply that same tax to all of J&J's insurance coverage throughout the country.  Johnson & Johnson, 30 N.J. Tax at 512.  We disagree.

As previously discussed, the above paragraph is limited by its express terms to "surplus lines polic[ies] cover[ing] risks or exposures in this State and other states[.]"  J&J does not procure surplus lines coverage from Middlesex Assurance.  Thus, this paragraph of N.J.S.A. 17:22-6.64 is simply inapplicable to J&J.

The Tax Court also stated that there was no reason for the Legislature to include this paragraph in N.J.S.A. 17:22-6.64 because it had already included it in N.J.S.A. 17:22-6.59, which specifically applies to surplus line insurance. Ibid. Although the Tax Court stated it would

> not speculate on how or why the term "surplus lines policy" was used when amending N.J.S.A. 17:22-6.64 to conform to the NRRA[,] [t]he court [was] convinced that the New Jersey Legislature intended to include self-procured insurance in the adoption of the Home State Rule because it intended to include all nonadmitted insurers, and not to limit it to only surplus lines insurance. There is no other reason to have amended N.J.S.A. 17:22-6.64 in 2011.
>
> [Ibid.]

However, nothing in the plain language of N.J.S.A. 17:22-6.64 supports this interpretation. Even if the language of the statute is somehow ambiguous, the Tax Court specifically found that there was nothing in the legislative history of L. 2011, c. 119 that even discusses the self-procurement statute. Ibid. Under these circumstances, we are unable to conclude that the Legislature, by specifically stating that the Home State Rule only applied to surplus insurance coverage obtained through surplus line agents, likewise intended to extend it to the types of insurance coverage procured by J&J from Middlesex Assurance.

Thus, we believe that the Tax Court erred by effectively rewriting N.J.S.A. 17:22-6.64 to apply to J&J. O'Connell, 171 N.J. 488.

Moreover, even if the Legislature's action in specifically referring to surplus lines policies in N.J.S.A. 17:22-6.64 rendered that statute ambiguous, and its application to non-surplus lines insurance in doubt, this doubt would have to be resolved in J&J's favor. Fedders Fin. Corp., 96 N.J. at 384. Indeed, as the Supreme Court made clear in Fedders:

> In the interpretation of statutes levying taxes[,] it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt[,] they are construed most strongly against the government, and in favor of the [taxpayer].
>
> [Id. at 385 (quoting Gould v. Gould, 245 U.S. 151, 153 (1917)).]

Thus, the Home State Rule tax applicable to surplus lines policies and premiums should not be imposed upon J&J.

In sum, the plain language of N.J.S.A. 17:22-6.64 does not apply to J&J. This is so because J&J obtained insurance from Middlesex Assurance, a subsidiary and a captive insurance company. The insurance was self-procured and was not obtained from either a surplus lines insurer or a surplus lines agent. It was definitely not a surplus lines policy, a condition precedent to the

23

application of the Home State Rule under the clear language of the statute. Thus, the Tax Court erred in extending the Home State Rule to J&J.

Accordingly, we reverse the Tax Court's denial of J&J's refund request, and remand for a determination of the amount of the refund due J&J.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5423-17T3