NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2883-20

SCOTT C. MALZBERG, a/k/a
SCOTT MALZBERG,

Plaintiff-Appellant,

v.

CAREN L. JOSEY, JAMES
RIVER INSURANCE COMPANY,
PORTIER, LLC, and RIDER
INSURANCE COMPANY,

     Defendant-Respondents.

_____

> **APPROVED FOR PUBLICATION**
>
> **September 27, 2022**
>
> **APPELLATE DIVISION**

Submitted September 13, 2022 – Decided September 27, 2022

Before Judges Sumners, Geiger, and Susswein.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Docket No. L-7858-17.

Davis, Saperstein & Salomon, PC, attorneys for
appellant (Grace E. Robol, of counsel and on the
briefs).

Goetz, Schenker, Blee & Wiederhorn, attorneys for
respondent James River Insurance Company (Daniel
Szep, on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Plaintiff Scott C. Malzberg appeals from the January 25, 2019 Law Division order granting summary judgment in favor of defendant James River Insurance Company (James River), dismissing plaintiff's claim for underinsured motorist coverage. This case presents a question of first impression regarding the scope of the Transportation Network Company Safety and Regulatory Act (TNCSRA or Act), N.J.S.A. 39:5H-1 to -27. Plaintiff was injured in a motor vehicle accident while he was operating his motorcycle as an Uber Eats delivery driver. The sole legal issue raised in this appeal is whether the Act—which requires "transportation network companies" (TNCs) to provide at least $1.5 million in underinsured motorist coverage—applies to food delivery services, such as Uber Eats.

In granting summary judgment dismissal, Judge Stephen L. Petrillo held that the Act only regulates companies that use a digital network such as a mobile phone application (app) to connect a "rider" to a "prearranged ride." See N.J.S.A. 39:5H-2. Judge Petrillo concluded that the Act applies only to the prearranged transport of persons and not to the delivery of food. We agree. Nothing in the statutory text or legislative history of the TNCSRA suggests that the Legislature intended to regulate app-based food delivery services.

A-2883-20

I.

We discern the following pertinent facts and procedural history from the record. On June 30, 2017, plaintiff enrolled with defendant Portier, LLC (Portier) to use his personal vehicle—a motorcycle—to deliver food. Portier generates leads to independent food delivery service providers—the drivers—through a mobile phone application known as Uber Eats.[1] The Uber Eats app allows food delivery service providers and restaurants to connect with each other so that they can fulfill orders placed by consumers.

Plaintiff was required to sign a "Technology Services Agreement" with Portier. Section 8.3 of that agreement provides:

> You understand and acknowledge that your own insurance policy (e.g., automobile or other liability insurance policy) may not afford liability, comprehensive, collision, medical payments, personal injury protection, uninsured motorist, underinsured motorist, damage to property in your care, custody and control, or other coverage for the Delivery Services you provide pursuant to this Agreement. If you have

---

[1] Judge Petrillo noted that Portier is a:

> [W]holly-owned subsidiary of Uber Technologies, hereinafter referred to as Uber, [which] provides lead generation services to independent providers of food delivery services through Uber's mobile application known as Uber Eats. That is, essentially, a spin-off of the ride sharing company which uses Uber's existing fleet of independent drivers to deliver food from participating restaurants directly to consumers.

A-2883-20

any questions or concerns about the scope or applicability of your own insurance coverage, it is your responsibility, not that of [Portier], to resolve them with your insurer(s).

Section 8.4 of the Services Technology Agreement further provides that:

[Portier] may maintain during the term of this Agreement insurance related to your provision of Delivery Services as determined by [Portier] in its reasonable discretion, provided that [Portier] and its Affiliates are not required to provide you with any specific insurance coverage for any loss to your Transportation Method or injury to you.

On August 17, 2017, plaintiff was in the process of making a food delivery for Uber Eats when a vehicle driven by defendant Caren L. Josey (Josey) made a left turn onto the Route 17 entrance ramp in Hackensack and collided with plaintiff's motorcycle. Plaintiff was thrown from the motorcycle and sustained significant injuries requiring multiple surgeries.

Josey was insured by CURE Auto Insurance with bodily injury liability coverage limited to $15,000 per person and $30,000 per accident. Plaintiff's injuries exceeded the limits of Josey's personal auto insurance policy.

Portier had procured a business auto insurance policy from James River. That policy provides in pertinent part, "[w]e will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" The James River policy

4

defines an "insured" to include "Delivery Drivers" who have entered into a contract to use the "UberPartner Application" and who have logged into the "UberPartner Application." Importantly, however, the James River policy does not provide underinsured motorist benefits.

On November 6, 2017, plaintiff filed a complaint against Josey claiming negligence. On December 28, 2017, plaintiff filed an amended complaint, adding James River as a defendant and seeking coverage from James River for plaintiff's injuries that exceeded the limits of Josey's personal auto insurance policy. On February 8, 2018, plaintiff filed a second amended complaint, adding Portier as a defendant. Plaintiff alleged in the second amended complaint that, at the time of the accident, he was "employed and/or insured with [Portier], the insured of defendant [James River]" and claimed that he is "entitled to underinsured motorist benefits from defendant [James River]." On April 16, 2018, plaintiff filed a third amended complaint, adding Rider Insurance Company as a defendant.[2]

---

[2] The complaint against Rider Insurance Company has no bearing on the substantive issue presented in this appeal and is pertinent only insofar as the date of its dismissal with prejudice determines when all complaints in the matter were finally resolved. See infra Section II (discussing James River's contention that the present appeal was not timely filed and should not be heard).

On October 12, 2018, the complaint against Portier was dismissed without prejudice and that matter was compelled to arbitration. The complaints against the other defendants were not affected by the order to compel arbitration.

Following the exchange of discovery, James River filed a motion for summary judgment seeking dismissal of the complaint against it with prejudice. On January 25, 2019, Judge Petrillo convened oral argument on James River's motion for summary judgment. At the conclusion of the hearing, the judge rendered an opinion on the record and issued an order granting James River's motion for summary judgment and dismissing the complaint with prejudice as to all claims against James River. The January 25, 2019 order is the subject of the present appeal.

On May 4, 2020, a stipulation of dismissal with prejudice was filed with respect to the complaint against Josey. A stipulation of dismissal with prejudice was filed as to defendant Rider Insurance Company on June 29, 2020. The complaint against Portier—which had been dismissed without prejudice when that matter was compelled to arbitration—was reinstated and restored to the active trial calendar by order dated March 10, 2021. A stipulation of dismissal with prejudice as to Portier was filed on May 11, 2021. The present appeal was filed on June 15, 2021.

A-2883-20

Plaintiff raises the following contention for our consideration:

POINT I:

THE TRIAL COURT IMPROPERLY GRANTED THE SUMMARY JUDGMENT MOTION.

## II.

We first address James River's contention that plaintiff's appeal was filed untimely pursuant to Rule 2:4-1(a), which generally requires that appeals from final judgments be filed within forty-five days of their entry. A judgment is deemed to be final when all claims as to all parties are resolved. See R. 2:2-3(b) ("Final judgments of a court, for appeal purposes, are judgments that finally resolve all issues as to all parties."). James River argues that the forty-five-day deadline for filing this appeal started to run when the stipulation of dismissal with prejudice was filed as to defendant Rider Insurance Company on June 29, 2020. We disagree; the forty-five-day deadline started to run when the claims against Porter were resolved.

Rule 2:2-3(a) governs the right to appeal from final judgments and delineates various orders that, although interlocutory, are deemed final for purposes of filing an appeal as of right. GMAC v. Pittella, 205 N.J. 572, 583 (2011). In Pittella, our Supreme Court addressed "whether an order compelling arbitration as to one or more, but not all, claims and parties is final for purposes of appeal." 205 N.J. at 574. The Court exercised its rulemaking

authority to amend Rule 2:2-3(a) to add orders compelling arbitration to the list of interlocutory orders that are deemed final for purposes of appeal. Id. at 586. To dispel any doubts about the need to seek timely appellate review of an order compelling arbitration, the Court admonished, "[b]ecause the order shall be deemed final, a timely appeal on the issue must be taken then or not at all." Ibid. The Court reasoned that "[a] party cannot await the results of compelled arbitration and gamble on the results" before filing an appeal. Ibid.

The appeal before us is distinguishable from the circumstances in Pittella. In that case, Pittella appealed from the order compelling arbitration. In contrast, in the present matter, the subject matter of the appeal brought by plaintiff is not related to the October 12, 2018 order to compel arbitration of plaintiff's claim against Portier. Rather, plaintiff appeals from the order granting summary judgment dismissal in favor of James River. We agree with plaintiff that, in this case, the claims against all parties were not finally resolved for purposes of Rule 2:2-3(a) until the complaint against Portier was resolved through the stipulation of dismissal entered on May 11, 2021. Thus, the present notice of appeal, filed on June 15, 2021, was timely filed within forty-five days of that milestone.

III.

We turn next to the novel substantive issue plaintiff raises. Rule 4:46-2(c) directs that summary judgment shall be granted "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." An appellate court employs that same standard and reviews the Law Division decision de novo. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). No special deference is afforded to the trial court's interpretations of the law and legal consequences that flow from established facts. Invs. Bank v. Torres, 243 N.J. 25, 47 (2020) (citing Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)). We emphasize that, in this instance, there is no dispute as to the relevant facts. Rather, this case hinges on an interpretation of the scope of the TNCSRA. We therefore review the trial court's interpretation of the statute with a fresh set of eyes.

A.

We begin our analysis of the Act by acknowledging certain basic principles of statutory construction. Our Supreme Court has clearly stated that "[t]he overriding goal of all statutory interpretation 'is to determine as best we

9                                                      A-2883-20

can the intent of the Legislature, and to give effect to that intent.'" State v. S.B., 230 N.J. 62, 67 (2017) (quoting State v. Robinson, 217 N.J. 594, 604 (2014)). Consequently, "[t]o determine the Legislature's intent, we look to the statute's language and give those terms their plain and ordinary meaning because 'the best indicator of that intent is the plain language chosen by the Legislature.'" State v. J.V., 242 N.J. 432, 442-43 (2020) (first citing DiProspero v. Penn, 183 N.J. 477, 492 (2005); and then quoting Johnson v. Roselle EZ Quick, LLC, 226 N.J. 370, 386 (2016)). Accordingly, "[i]f, based on a plain and ordinary reading of the statute, the statutory terms are clear and unambiguous, then the interpretative process ends, and we 'apply the law as written.'" Id. at 443 (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)). It is inappropriate for "[a] court . . . [to] rewrite a plainly[ ]written enactment of the Legislature [or to] presume that the Legislature intended something other than that expressed by way of the plain language." Ibid. (third alteration in original) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)). Only "[i]f . . . the statutory text is ambiguous, [can courts] resort to 'extrinsic interpretative aids, including legislative history,' to determine the statute's meaning." Ibid. (quoting S.B., 230 N.J. at 68).

There have been no published cases interpreting the insurance-related provisions of the TNCSRA, or any other provision of the Act for that matter.

The core issue, in a nutshell, is whether the Act regulates app-based food delivery services or instead is limited to regulating companies and drivers that arrange and provide transportation services for passengers.

In determining the scope of the statute's intended reach, that is, its "overall meaning," see Miah v. Ahmed, 179 N.J. 511, 521 (2004), we pay special attention to the definition section. Even before we carefully examine the plain text of specific definitions, we consider which terms and phrases the Legislature saw fit to define rather than rely on their plain and ordinary meaning. The very existence—or non-existence—of specific definitions reveals the basic concepts and principles the Legislature deemed to be especially important, warranting precise and explicit formulations. The Legislature's decision to define certain terms but not others can thus provide insight into the overall meaning of the statutory scheme and the scope of its reach.

We next reproduce the definitions set forth in N.J.S.A. 39:5H-2 that are directly relevant to this appeal:

> "Personal vehicle" means a motor vehicle that is used by a transportation network company driver to provide prearranged rides and is owned, leased, or otherwise authorized for use by the transportation network company driver. . . .
>
> "Prearranged ride" means the provision of transportation by a transportation network company

driver to a transportation network company rider, beginning when a driver accepts a ride requested by a rider through a digital network controlled by a transportation network company, continuing while the driver transports a requesting rider, and ending when the last requesting rider departs from the personal vehicle. . . .

"Transportation network company" means a corporation, partnership, sole proprietorship, or other entity that is registered as a business in the State or operates in this State, and uses a digital network to connect a transportation network company rider to a transportation network company driver to provide a prearranged ride. . . .

"Transportation network company driver" or "driver" means a person who receives connections to potential riders and related services from a transportation network company in exchange for payment of a fee to the transportation network company, and uses a personal vehicle to offer or provide a prearranged ride to a rider upon connection through a digital network controlled by a transportation network company in return for compensation or payment of a fee.

"Transportation network company rider" or "rider" means a person who uses a transportation network company's digital network to connect with a transportation network company driver to receive a prearranged ride from the driver using the driver's personal vehicle.

[N.J.S.A. 39:5H-2.]

Most notably, nothing in the definition section—or any other section of the Act for that matter—refers to the delivery of food. The absence of any

reference to food delivery in the definition section stands in stark contrast to the interrelated definitions that refer explicitly and repeatedly to "rides" and "riders," which clearly denote the transport of human passengers.

Furthermore, the list of for-hire motor vehicles that are expressly excluded from the Act's reach[3] all share an important common feature: they are all used to transport passengers. Accordingly, every type of vehicle specifically mentioned in the definition section of the TNCSRA, whether included or excluded from the Act's governance, is used to transport people. It bears noting that the Act specifically exempts transportation network company drivers from registering their personal vehicles as "commercial or for hire vehicle[s]." N.J.S.A. 39:5H-3. Apart from that exemption, there are no other references in the Act to "commercial vehicles," which are defined in N.J.S.A.

---

[3]  Specifically, the definitions of "personal vehicle" and "prearranged ride" exclude autocabs, taxis, limousines, autobuses, jitneys, motor buses, other for-hire vehicles, and vehicles used for carpools and van pools. The definition of "transportation network company" further excludes entities that arrange non-emergency medical transportation services for certain Medicaid and Medicare recipients. The list of excluded vehicles is important in revealing the scope of the statutory scheme because the Act explicitly provides that transportation network companies and drivers are governed exclusively by the TNCSRA. N.J.S.A. 39:5H-26. Under this framework, transportation network companies and drivers are not required to register their personal vehicles as commercial for-hire vehicles. N.J.S.A. 39:5H-3. Nor are they required to obtain a license or permit from a county or municipality. N.J.S.A. 39:5H-26. The excluded vehicles, in contrast, remain subject to other statutes, regulations, and local ordinances that govern the licensing and operation of for-hire vehicles used to transport passengers.

39:1-1 to "include[] every type of motor-driven vehicle used for commercial purposes on the highways, such as the transportation of goods, wares and merchandise." N.J.S.A. 39:1-1. The absence of any reference in the definition section to any vehicles that transport goods rather than passengers supports our conclusion that the Legislature in enacting the TNCSRA was concerned only with vehicles while they are being used to transport persons. Cf. Hovbilt, Inc. v. Township of Howell, 263 N.J. Super. 567, 571 (App. Div. 1993) (explaining that under the principle of ejusdem generis, "when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words[,] . . . sav[ing] the legislature from spelling out in advance every contingency in which the statute could apply").

Aside from the definition section, the text of the entire Act includes only one explicit reference to services that involve the transport of something other than persons, and that reference is done in the context of explaining what transportation network companies and drivers may not do if they are to remain within the scope of the Act. Specifically, N.J.S.A. 39:5H-3 provides:

> A transportation network company or a transportation network company driver shall not provide a taxi, limousine, or other for-hire vehicle service, or freight service except as authorized pursuant to applicable law. A transportation network company driver shall not be required to register the driver's personal vehicle

used to provide prearranged rides as a commercial or for-hire vehicle.

[N.J.S.A. 39:5H-3 (emphasis added).]

This provision confirms that freight services are governed by other applicable laws, not the TNCSRA. Given that the Act expressly provides that transportation network companies and drivers "shall be governed exclusively by [the Act]," N.J.S.A. 39:5H-26, the declaration that freight services are subject to other applicable laws bolsters our conclusion that such services fall outside the Act's intended reach. It also shows conclusively that the Legislature knew how to refer to non-passenger transportation services but did so only in the context of explaining what is <u>not</u> governed by the TNCSRA. <u>Cf.</u> <u>DiProspero</u>, 183 N.J. at 495 ("The canon of statutory construction, <u>expressio</u> <u>unius est exclusio alterius</u>—expression of one thing suggests the exclusion of another left unmentioned—sheds some light on the interpretative analysis." (quoting <u>Brodsky v. Grinnell Haulers, Inc.</u>, 181 N.J. 102, 112 (2004))).

B.

Turning to the substantive provisions of the Act that plaintiff relies upon, N.J.S.A. 39:5H-10 comprehensively establishes the requirements for insurance coverage. That section specifies different levels of required minimum coverage depending on whether a driver who has logged into the transportation network company's digital network is available to receive a

15

prearranged ride request but is not providing a prearranged ride. Pertinent to this appeal, N.J.S.A. 39:5H-10(c) specifically states that:

> Whenever a transportation network company driver is providing a prearranged ride, the transportation network company driver, transportation network company, or any combination of the two shall maintain the following insurance coverage:
>
> (1) primary automobile liability insurance in the amount of at least $1,500,000 for death, bodily injury, and property damage;
>
> (2) primary automobile insurance for medical payments benefits in an amount of at least $10,000 per person per incident, which shall only apply to and provide coverage for the benefit of the transportation network company driver; and
>
> (3) uninsured and underinsured motorist coverage in an amount of at least $1,500,000.
>
> [N.J.S.A. 39:5H-10(c).]

Plaintiff relies on the requirement set forth in subparagraph 3 to support his claim that James River's policy must provide underinsured motorist coverage in the amount of at least $1,500,000. However, that provision by its literal terms applies only when a "transportation network company driver is providing a prearranged ride," thereby incorporating the Act's precise and unambiguous definitions of the terms "transportation network company driver" and "prearranged ride." The insurance-related provisions, we emphasize,

16

cannot be read in isolation, but rather must be construed as part of an integrated whole.  See Miah, 179 N.J. at 521.

Plaintiff contends that transporting food is covered under the Act because "[t]he definition of a transportation network driver is a person who receives connections to potential riders **and related services** from a transportation network company."[4]  Defendant's central argument relies principally, if not exclusively, on the phrase "and related services," which he broadly construes to include food delivery.

We reject plaintiff's contention that this isolated phrase so significantly expands the scope of the statutory scheme.  We acknowledge the general principle of statutory construction that we must give meaning to every word and phrase in a statute.  See Meehan v. Antonellis, 226 N.J. 216, 237-38 (2016).  In this instance, however, plaintiff's construction of the phrase "and related services" disregards the plain meaning of other words and phrases employed in the statute, indeed, employed in the same sentence that plaintiff quotes.  Plaintiff's argument is thus inconsistent with the well-established canon of statutory construction that "a statute is to be interpreted in an integrated way without undue emphasis on any particular word or phrase and,

_____

[4]  We note that we are quoting plaintiff's contention in his brief, not the statutory definition listed in N.J.S.A. 39:5H-2, which does not contain the reproduced emphasis.

if possible, in a manner which harmonizes all of its parts so as to do justice to its overall meaning." Miah, 179 N.J. at 521 (quoting Chasin v. Montclair State Univ., 159 N.J. 418, 427 (1999)).

In line with that canon of statutory construction, the phrase "and related services" must be understood in the context of the other language employed in the definition of the term "transportation network company driver." See ibid. As our Supreme Court explained in Miah, "[t]he meaning of words [used in a statute] may be indicated and controlled by those [words] with which they are associated." Ibid. (second and third alterations in original) (quoting Germann v. Matriss, 55 N.J. 193, 220 (1970)).

In this application, the "related services" referred to in the definition of "transportation network company driver" are limited to services that pertain directly to "connections to potential riders." As we have noted, the term "riders" clearly refers to persons, not items. Such appurtenant services might include, for example, handling (onloading/stowing/offloading) the rider's luggage. The phrase might also apply to the prearranged transport of a pet or service animal that is accompanying the rider.[5] The critical point is that,

---

[5] We note that the only reference to animals in the TNCSRA is found in the section that requires TNCs to adopt a policy of non-discrimination. See N.J.S.A. 39:5H-15(c). That section provides that drivers "shall comply with all applicable laws relating to accommodation of service animals." Ibid.

contrary to plaintiff's broad construction, the phrase "and related services" presupposes a connection to arrange the transportation of a rider.

## C.

In sum, we believe the primary question posed in this case is easily resolved under a plain-text analysis. The statutory scheme comprehensively regulates app-based services that provide rides to human passengers. As we have stressed, nothing in the statutory text mentions, much less comprehensively regulates, the delivery of food. In these circumstances, we need not consider extrinsic sources to determine legislative intent. See J.V., 242 N.J. at 443.

Although we need not look to legislative history to clarify the Act's plain language, we note in the interest of completeness that plaintiff cites no legislative history suggesting a driver is covered under the TNCSRA while delivering food. Our review of the legislative history reveals nothing that might conceivably support plaintiff's contention that the Act applies to food delivery services.

19

The only extrinsic interpretative aid plaintiff presents for our consideration is an excerpt from the New Jersey Motor Vehicle Commission (MVC)[6] website, which explains:

> The MVC is implementing new requirements for TNCs, which use a digital network to connect a rider to a driver to provide a prearranged ride. The Transportation Network Company Safety and Regulatory Act establishes safety and insurance requirements for TNCs that conduct business in New Jersey in order to protect drivers as well as the riding public.
>
> [Transportation Network Company (TNC) Safety and Regulatory Act, N.J. MOTOR VEHICLE COMM'N, https://www.state.nj.us/mvc/business/tnc.htm (last visited Sept. 20, 2022).]

We agree with plaintiff that the Act serves to protect drivers as well as "the riding public." Ibid. But nothing on the webpage suggests that the safety and insurance requirements for transportation network companies set forth in the Act protect drivers while they are delivering food rather than providing prearranged rides to riders. On the contrary, the Frequently Asked Questions document linked on the same MVC webpage, explicitly states that a

---

[6] We note that the MVC is one of the agencies responsible for implementing the TNCSRA. N.J.S.A. 39:5H-27 authorizes both the MVC Commissioner and the Director of the Division of Consumer Affairs in the Department of Law and Public Safety to adopt rules and regulations to implement the Act. See also N.J.S.A. 39:5H-4.2 (also authorizing the Director of the Division of Taxation to adopt rules and regulations).

"prearranged ride" is "the provision of transportation by a TNC driver to a TNC rider," which "begin[s] when a driver accepts a ride requested by a rider through a digital network controlled by a TNC, continu[es] while the driver transports a requesting rider, and end[s] when the last requesting rider departs from the driver's personal vehicle." Transportation Network Company Safety and Regulatory Act ("Act") Frequently Asked Questions ("FAQs"), N.J. MOTOR VEHICLE COMM'N 1, https://www.state.nj.us/mvc/pdf/business/tncfaq.pdf (last visited Sept. 20, 2022).

We find further extrinsic support for our interpretation of the Act in the regulations that have been promulgated by the MVC. See N.J.A.C. 13:21-26.1 to -26.9. It is well-established that a reviewing court "must be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009). Accordingly, implementing regulations are relevant in determining the scope and overall meaning of the statute pursuant to which those regulations were promulgated. However, we are "in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 302 (2011)

(alteration in original) (quoting <u>Mayflower Sec. Co. v. Bureau of Sec.</u>, 64 N.J. 85, 93 (1973)).

In this instance, the regulations promulgated by the MVC detail the licensing process for transportation network companies. Like the TNCSRA itself, nothing in those regulations mentions the transport of food or other goods. Although the regulatory definitions generally track the statutory definitions, <u>see</u> N.J.A.C 13:21-26.1, they create a new definition for the phrase "operation of a transportation network company." That phrase is defined to mean "engaging in the business of operating a digital network in the State to connect a <u>TNC rider</u> to a TNC driver to provide a prearranged ride." <u>Ibid.</u> (emphasis added). That definition shows that the regulatory framework, like the statutory scheme it implements, governs the use of mobile digital technology to arrange for the transport of riders, not the transport of food or other goods.

D.

The Legislature by enacting the TNCSRA clearly recognized the commercial and societal value of new technologies that use mobile digital networks to connect customers with service providers. But while the use of an app is necessary to trigger the Act's provisions, that alone is not sufficient. The Act does not automatically apply, in other words, whenever someone uses

22

an app to connect to a driver.  Rather, to fall within the Act's jurisdiction—and thus to invoke the protections of its minimum insurance coverage provisions— the app-based connection must be used to arrange a ride between a driver and a human rider.  In this case, plaintiff was not capable of acting as a TNC driver within the scope of the TNCSRA; his motorcycle does not meet the local vehicle requirements for driving passengers for Uber in New Jersey.  See Vehicle Requirements: New Jersey, UBER, https://www.uber.com/us/en/drive/new-jersey/vehicle-requirements/ (last visited Sept. 20, 2022) (listing a four-door vehicle as a minimum requirement for driving passengers).

We add that, while the TNCSRA is of comparatively recent vintage, it was enacted before the COVID-19 pandemic, during which the imperative for social distancing simultaneously increased the demand for home delivery of food and reduced the demand for ridesharing.[7]  But the evolution of the supply and demand marketplace since the TNCSRA was enacted does not change its plain text.  While there may be circumstances, not present here, where it is necessary and appropriate to teach an old law to do new tricks, a statute's text

---

[7]  We note that to maximize their income, transportation network company drivers on any given day may connect to multiple apps and perform multiple functions, delivering food on one trip and transporting passengers on another trip.

23

does not evolve sua sponte.  Reviewing courts must afford due deference to the legislative process; it is not for the Judiciary to amend a statute to account for new developments.

Plaintiff argues in this regard that "there is a hole in the law created by the constant evolution of technology."  In making this argument, he tacitly acknowledges that his situation falls outside the heartland of the statutory framework.  He asks us to fill that "hole" for his benefit, but it is not our place to do so.  As we have already stated, although the Act clearly serves to protect drivers and not just passengers, by its literal and unambiguous terms, it protects only those drivers who are in the process of arranging or providing a ride to a rider.

We appreciate that in this case, plaintiff was seriously injured and is seeking insurance coverage related to those injuries.  He is not seeking compensation from James River for lost or damaged personal property.  We stress, moreover, that the gravamen of plaintiff's argument is <u>not</u> that food should be protected under the Act.  No one contends that food is tantamount to human passengers in terms of the need for insurance coverage.  Rather, plaintiff argues that food delivery <u>drivers</u> should be afforded comparable protection to that which is given to drivers who are transporting prearranged riders.  That argument rests on the proposition that the risk of a motor vehicle

accident and ensuing injury to a driver is essentially the same while delivering food and while transporting a prearranged rider. See supra note 7 (recognizing that a driver may alternate between these two distinct types of app-based transportation services). The keystone of plaintiff's statutory construction argument is that there is no sound reason for the Legislature to have afforded insurance protection to a driver who is in the process of transporting a prearranged rider but not to that same driver in the same vehicle while he or she is in the process of fulfilling the prearranged delivery of food.

Although we appreciate the economic consequences of plaintiff's situation, his contention that there is a "hole" in the law raises policy considerations that simply are beyond our purview. See J.V., 242 N.J. at 443 ("A court may neither rewrite a plainly[ ]written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language." (alteration in original) (quoting O'Connell v. State, 171 N.J. at 488)). In the final analysis, it is for the Legislature, not trial or intermediate appellate courts, to fill the void to which plaintiff alludes.

We note that there is pending legislation that, if enacted, would do just that by supplementing the TNCSRA, establishing insurance coverage requirements for businesses that use a digital network to connect customers to

25                                                                    A-2883-20

a "delivery network company driver for the prearranged delivery of goods."[8] S. 486 (as amended by Senate, Mar. 24, 2022) (emphasis added). We decline to venture an opinion on whether that pending legislation supports or undermines plaintiff's arguments on this appeal. Compare In re Passaic Cnty. Utils. Auth. Petition, 321 N.J. Super. 186, 207 (App. Div. 1999) ("Reliance on proposed or pending legislation to interpret existing statutes is of little value."), rev'd on other grounds, 164 N.J. 270 (2000), and State v. Tormasi, 466 N.J. Super. 51, 65 (App. Div. 2021) ("We place little value on legislative proposals that are not enacted into law."), certif. granted, 250 N.J. 6 (2022), with Voges v. Borough of Tinton Falls, 268 N.J. Super. 279, 285 (App. Div. 1993) ("Statutes [cannot] be read in a vacuum void of relevant historical and policy considerations and related legislation." (quoting Helfrich v. Hamilton Twp., 182 N.J. Super. 365, 370 (App. Div. 1981))). All we can say for certain is that the TNCSRA in its present form does not apply to the circumstances of this case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8] The bill as amended defines a "good" to mean "any item, including food, other than mail or a package to which postage has been affixed." S. 486 (as amended by Senate, Mar. 24, 2022) (emphasis added).

A-2883-20